UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| BARBARA JEAN MOONEY | ) | |
| | ) | |
| V. | ) | NO. 2:11-CV-56 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

# REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act were denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 37 years of age with a high school education. She was found by the ALJ to be unable to return to her past relevant work. She alleges disability due to problems with her heart and aorta, degenerative disc disease of her neck and back, kidney disease, COPD, and a severe mental impairment.

The medical evidence is summarized in the plaintiff's brief as follows:

> Dr. Harrison D. Turner treated Plaintiff from October 24, 1974 through August 8, 2007, for follow-up of valvular heart disease and long-standing aortic regurgitation with associated congenitally bicuspid aortic valve with some element of stenosis. Additional problems noted during treatment include heart murmur, palpitations, exertional shortness of breath, chronic fatigue, dizziness, lightheadedness, long history of anxiety and depression, chest pains, lower extremity edema, renal cell cancer, history of migraines, urinary stress incontinence, chronic obstructive pulmonary disease [hereinafter "COPD"], irritable bowel symptoms, chronic nausea, left lower extremity pain, and right hand numbness (Tr. 117-175). On January 3, 2007, Dr. Turner noted Plaintiff may be active within the limits of her comfort (Tr. 122). On August 8, 2007, Dr. Turner again noted Plaintiff may be active within the limits of her comfort, but is to avoid vigorous isometric type of exercises (Tr. 119).
> 
> Plaintiff received treatment at Appalachian Family Care from September 18, 2006 through July 10, 2008. Treatment was rendered for chronic back pain, renal carcinoma status post kidney removal, nausea with vomiting, urinary tract infections, anxiety, esophageal reflux, chronic airway obstruction, chronic abdominal pain, night sweats, hair loss, fatigue, constipation, shortness of breath, decreased stamina, hypertension, intermittent dysuria and polyuria, and diaphragmatic hernia. It was consistently noted that medication was helping Plaintiff's anxiety, but she continued to have difficulty with symptom control. Every exam was remarkable for anxious affect, diminished breath sounds in the lungs with prolonged expiratory phase, right upper quadrant tenderness, diffuse tenderness to palpation in the lumbosacral spine, guarding with positional changes, and pain response with flexion of the spine with limited range of motion (Tr. 176-236). On December 29, 2005, lumbar spine x-rays showed apparent remote compression deformity of the superior one-half of the L2 vertebral body (Tr. 220).

Plaintiff received pain management treatment by Dr. Sheng Tchou from February 26, 2008 through April 22, 2008. Plaintiff received medication and injections for the diagnoses of chronic cervical myofascial pain with muscle spasms and tendonitis, chronic shoulder pain with tendonitis, chronic lumbar myofascial pain with muscle spasms and tendonitis, chronic hip pain with tendonitis, sacroiliitis, and bilateral knee pain with arthritis and tendonitis (Tr. 244-256).

Plaintiff was admitted to University of Tennessee Memorial Hospital from June 26, 2006 through June 29, 2006, due to the diagnosis of a left renal mass which was enhancing and consistent with renal cell carcinoma. Plaintiff underwent removal of her left kidney. The pathology report noted a final diagnosis of renal cell carcinoma, with tumor invading perirenal sinus fat (Tr. 257-264).

Dr. Ray Lamb treated Plaintiff from September 22, 2006 through May 16, 2008. Conditions and complaints addressed include renal cell cancer status post left kidney removal, urinary incontinence, daily headaches, coughing, wheezing, nausea, daytime sleepiness, anxiety, ascending aortic aneurysm, low back pain, dizziness, abdominal tenderness, urinary frequency, dysuria, heart murmur, and bronchitis (Tr. 265-291).

Dr. Swatantra Kodali treated Plaintiff from October 12, 2006 through October 10, 2007. The handwritten notes are nearly completely illegible, but do reflect treatment for the diagnoses of bipolar disorder, major depressive disorder, and generalized anxiety disorder (Tr. 292-298).

Dr. Jeffrey P. Fenyves treated Plaintiff from October 13, 2006 through October 27, 2006, due to dyspepsia with nausea and vomiting, weight loss, and irritable bowel syndrome (Tr. 299-306). Dr. H. Andrew Poret, III treated Plaintiff from February 5, 2007, through February 11, 2008, for follow-up of ascending aortic aneurysm (Tr. 311-318).

On January 7, 2008, a reviewing state agency physician opined there was insufficient evidence with which to determine Plaintiff's mental limitations prior to her date last insured of June 30, 2007 (Tr. 319-332).

Plaintiff underwent consultative exam by Dr. Samuel Breeding on January 16, 2008. Presenting problems included osteoarthritis causing pain from the neck to the tailbone, pain radiating down both of the legs, cramps in the legs, difficulty sleeping, fibromyalgia, right shoulder pain, partial stomach paralysis, left knee pain, COPD, nerve damage to the top of the left foot, narcotic addiction, antisocial behavior, dislike of people, aortic aneurysm, irritable bowel syndrome, and acid reflux. Exam was remarkable for heart murmur and decreased lumbar range of motion. The diagnoses were history of back pain, history of fibromyalgia, history of right shoulder surgery, history of renal cancer, history of COPD, anxiety/depression, and recent history of aortic aneurysm. Dr. Breeding opined Plaintiff can sit four to six hours in an eight-hour day; can stand for two to four hours in an eight-hour day; and can lift ten pounds occasionally (Tr. 333-337).

On February 25, 2008, a reviewing state agency physician opined Plaintiff can frequently climb, balance, stoop, kneel, crouch, and crawl. Pages one and two of the assessment form are missing (Tr. 338-341). On May 27, 2008, a reviewing state agency physician opined Plaintiff can lift/carry a maximum of 50 pounds occasionally, 25 pounds frequently; can stand/walk for a total of about six hours in an eight-hour workday; can sit for a total of about six hours in an eight-hour workday; and can

3

frequently climb, balance, stoop, kneel, crouch, and crawl. Dr. Misra did not report what medical records were reviewed in reaching this conclusion, but specifically stated there was no treating or examining source statement(s) regarding claimant's physical capacities in the file, indicating he did not review Dr. Breeding's report (Tr. 342-347).

On October 6, 2008, Plaintiff underwent consultative exam by Dr. Steven Lawhon, Psy.D. Plaintiff's affect and mood were depressed; she said she has been told that she is antisocial; she stated that her thoughts are speeded up; she was unable to recall the current President; and she was unable to discuss current events. Dr. Lawhon noted Plaintiff is depressed, moody, irritable, and easily frustrated; she readily admitted that one of her problems is anger and antisocial behavior; she reported a dysfunctional family background; there are things in her presentation that suggest that a bipolar disorder does need to be considered; she is very angry and bitter; she has had conflicts with lots of different folks including healthcare providers; and she clearly needs symptomatic treatment for her depression. The diagnoses were mood disorder NOS, alcohol abuse (in partial remission), polysubstance abuse (in partial remission), and antisocial personality traits, with a current global assessment of functioning [hereinafter "GAF"] of 58 and a past GAF of 70. Dr. Lawhon opined Plaintiff's ability to sustain concentration and persistence is moderately limited; her work adaptation is mildly to moderately limited; and her social interaction is mildly limited (Tr. 348-352).

On October 27, 2008, a reviewing state agency physician opined Plaintiff is moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting (Tr. 353-370).

Plaintiff received treatment at East Tennessee Brain & Spine Center from November 12, 2008 through April 22, 2009, due to the diagnoses of cervical disc degeneration, lumbar/ lumbosacral disc degeneration, lumbar vertebral compression fracture, cervical disc HNP, and cervical radiculopathy. Conditions and complaints addressed include gradually worsening low back pain radiating into the left leg, gradually worsening neck pain, fatigue, night sweats, irregular heartbeat, palpitations, shortness of breath, calf pain, joint pain, muscle twitching, muscle weakness, loss of urinary control, mood changes, back stiffness, left leg numbness, elevated blood pressure, abdominal pain, and nausea and vomiting. Exams were remarkable for decreased range of motion and tenderness in the cervical spine and lumbosacral spine and muscle spasms (Tr. 371-419A).

On November 19, 2008, MRI of Plaintiff's cervical spine showed bulging disc and a small left paracentral disc protrusion at the C5-C6 disc level with the disc protrusion producing very minimal mass effect upon the left anterior paracentral subarachnoid space, bulging discs at the C4-C5 and C5-C6 levels, and a remote superior endplate compression deformity of the T1 vertebra. MRI of the lumbar spine revealed a central to left paracentral disc extrusion from the T12-L1 disc with superior migration of the disc fragment, diffuse posterior annular bulge of the disc from the L1-L2 disc level, remote superior endplate deformities of T12 and L2, and Schmorl's node deformities representing protrusion of disc material through bony endplates at the

4

superior L2 and superior L3 levels (Tr. 399-402).

Plaintiff continued treatment by Dr. Turner from July 8, 2008 through October 23, 2008, for continued follow-up of valvular heart disease and ascending aortic aneurysm. Additional problems noted during treatment include shortness of breath, lower extremity edema, fatigue, and heart murmur (Tr. 420-437).

Plaintiff returned to Dr. Lamb on September 9, 2008, for routine follow-up of renal cell cancer and thoracic aneurysm. It was noted that Plaintiff had been plagued with dysuria in the absence of abnormal urinalysis, right flank pain, incomplete bladder emptying, weight loss, and extreme fatigue since her surgery was performed. The assessment was renal cell cancer; dysuria, etiology undetermined; and fatigue (Tr. 438-439, 444-446, 452).

Plaintiff continued treatment by Dr. Kodali from January 29, 2008 through June 15, 2009. Again, the handwritten notes are nearly completely illegible, but do note treatment for the diagnoses of bipolar disorder and generalized anxiety disorder (Tr. 460-466). During 2009 (complete date illegible), Dr. Kodali opined Plaintiff has no useful ability (poor/none) to follow work rules, relate to coworkers, interact with supervisors, or deal with work stresses. Plaintiff's ability to function was noted to be seriously limited, but not precluded (fair) in the areas of deal with public and use judgment with the public (Tr. 458-459).

Plaintiff received treatment at Holston Valley Medical Center on 14 occasions from August 7, 2005 through July 8, 2008, due to right hand contusion, nausea and weakness secondary to Lithium, left foot sprain, chest pain, right wrist pain, knee contusion, right foot sprain, finger contusion, neck pain, GERD, and low back pain (Tr. 468-497).

Plaintiff continued treatment at Appalachian Family Care from July 18, 2008 through October 8, 2009, during which time she was suffering urinary incontinence, COPD, esophageal reflux, chronic back pain, hernia, renal disease, GERD, muscle pain, aortic aneurysm, heart murmur, chest pain, bronchitis, shortness of breath, increased anxiety, stomach pain, fatigue, upper respiratory infection, thyrotoxicosis, hair thinning, dry skin, mood swings, urinary tract infection, decreased stamina, intermittent joint pain, proteinuria, hypoglycemia, and muscle spasms (Tr. 605-643, 666-673, 682-692).

Plaintiff continued pain management treatment by Dr. Tchou from May 5, 2008 through August 5, 2008, due to chronic cervical pain with muscle spasms and tendonitis, chronic shoulder pain with tendonitis, chronic lumbar pain with muscle spasms and tendonitis, chronic hp pain with tendonitis, sacroiliitis, bilateral knee pain with arthritis and tendonitis, and decreased cervical and lumbar range of motion (Tr. 697-709).

Plaintiff received treatment at Holston Valley Medical Center five times from May 25, 2009 through July 31, 2009, due to dysuria, abdominal pain, right hand contusion, low back pain, sore throat, and cough (Tr. 712-726). On July 5, 2009, lumbar spine x-rays showed moderate compression of the L2 vertebral body and spondylosis at L2-3 and L3-4 (Tr. 720).

On August 12, 2009, Plaintiff underwent consultative exam by Elizabeth A. Jones, M.A. Plaintiff's affect was initially somewhat hostile, but later mildly blunted. Plaintiff reported that she has temper control issues and hates people in general; that she has anger issues and was ready to kill her husband in the past; that she doesn't get along with her family members; that her second marriage was very abusive; that she gets

5

nervous sometimes; and that she is unable to manage finances, which her son does for her. WAIS-II testing yielded a Verbal IQ score of 103, a Performance IQ score of 104, and a Full Scale IQ score of 103. Ms. Jones noted Plaintiff was quite disinhibited and frequently used profanity, which would likely be disconcerting to others. The diagnoses were opioid dependence and antisocial personality disorder, with a GAF of 60-65. Ms. Jones opined Plaintiff is moderately limited in her ability to interact appropriately with the public, supervisor(s), and coworkers, due to antisocial personality disorder (Tr. 727-737).

[Doc. 11, pgs. 2-8].

At the administrative hearing on November 5, 2009, the ALJ took the testimony of Dr. Theron Blickenstaff, M.D., a "medical expert," who had carefully reviewed the plaintiff's medical records. He was asked by the ALJ if he had "an opinion as to whether the Claimant has a severe impairment, and if so, what limitations arise therefrom..." Dr. Blickenstaff proceeded to discuss in detail the records of the plaintiff's cardiologist discussing her aortic valve disease and her aortic aneurism. He noted that after the discovery of the aneurism, her doctor "recommended activity as tolerated but to avoid vigorous isometric exercises..." in August of 2007, and that in October of 2008 he told her "to avoid the most strenuous of exertion." Dr. Blickenstaff then noted that serial imaging of the aneurysm did not show any increase in size since it was discovered. Based upon this, he opined the plaintiff's "value for exertion would be something in the range of lifting no more than 40 pounds occasionally, 20 pounds frequently. But that's really the only physical issue documented in the record." (Tr. 817).

The ALJ then permitted plaintiff's counsel to cross-examine Dr. Blickenstaff. The attorney asked if, based upon the "x-ray documentations in regards to the back" if he had an opinion regarding her back problems. Dr. Blickenstaff apologized for not mentioning that during his direct examination, discussed the various findings regarding her back, and said "I

6

don't think that those findings would change the limitations today." He noted "no objective evidence" for any other conditions and said "it's a very poor correlation between the appearance of these imaging studies and reported symptoms possible...." (Tr. 818-19).

The ALJ then called Dr. Thomas E. Schacht, a clinical psychologist who had also reviewed the plaintiff's medical records, as an expert regarding the plaintiff's alleged mental impairment. The ALJ asked whether he had an opinion as to whether the plaintiff met or equaled a psychological impairment or whether she had a severe psychological impairment which caused work related restrictions. He also asked Dr. Schacht if there were any conflicts in the evidence which the ALJ needed to resolve. (Tr. 819). Based upon her college records, he opined she was of at least low average intelligence. Regarding "mental and emotional issues other than intelligence," Dr. Schacht discussed not only her mental but physical treatment history. He discussed in great detail the treatment records of Dr. Kodali, plaintiff's treating psychiatrist, and Dr. Kodali's assessment form. He found that the severe findings were "not consistent" with his treatment records which show normal mental status and normal mood on a recurring basis." (Tr. 822).

Dr. Schacht then discussed plaintiff's use of prescription controlled substances, once again not in generalities but in specifics. He pointed out that the plaintiff was seeing many different doctors at the same time and getting the same or very similar prescriptions and filling them at different pharmacies, at times on the same days. At one point, from December of 2007 into January of 2008, plaintiff received and filled four prescriptions for narcotics from four physicians at four different pharmacies. He could not match all of the prescriptions with their having even been filled, and opined that there could very well be

7

records from other pharmacies not disclosed by the plaintiff. He utilized the Tennessee Controlled Substance Database for some of this research, but noted that pharmacies in Virginia, only a few miles from plaintiff's residence, would not show up in the Tennessee database. (Tr. 823).

Dr. Schacht then discussed Dr. Lawhon's consultative examination. Dr. Lawhon mentioned various missing records from Woodbridge Hospital. Plaintiff told him she had quit outpatient therapy at Frontier Health because she became angry at a therapist. She told him someone had told her she was antisocial. Dr. Schacht noted Dr. Lawhon indicated plaintiff had been involved in substance abuse. Dr. Lawhon assigned moderate limits in interpersonal functioning and stress tolerance, and moderate limits in concentration and persistence. (Tr. 824). Dr. Schacht then reviewed (at the hearing) and discussed the report and assessment of Elizabeth Jones. That report noted plaintiff had "been dismissed from a pain clinic because of an irregular drug test." (Tr. 825). Plaintiff told Dr. Lawhon "I know I have a drug addiction. I never touched anything till I got sick in 2005 and he first prescribed Roxicet. They've taken everything away, now I buy it off the streets." Plaintiff told Dr. Lawhon that when she can't obtain her narcotics on the street she has "significant symptoms of withdrawal..." She said she shoplifts frequently and that "I break the law daily buying drugs off the street. I don't care, laws are made to be broken." (Tr. 826). Dr. Schacht continued to discuss Dr. Lawhon's findings. He said that Dr. Lawhon's mental assessment found "no limits with respect to capacity to understand, remember, and carry out instructions at any level, and moderate limits in her personal functioning related to antisocial

8

behavior." Ds Schacht defined "moderate" as "not less than satisfactory."[1] (Tr. 827-28).

On cross-examination by plaintiff's counsel about his own "opinion as to any diagnosis" Dr. Schacht himself had from reviewing the file of plaintiff's mental condition, Dr. Schacht stated "what is most objectively established by this record is substance abuse." When asked about the diagnosis of an antisocial personality disorder, Dr. Schacht stated "whether or not there's an antisocial personality disorder here is difficult to determine because everything she reports and as she displays in the exams, can be mimicked by substance abuse." (Tr. 829). He went on to opine that a reliable diagnosis of the existence or severity of a personality disorder could "not be reached as long as she continues using drugs. Because at a minimum, even if there are residual underlying problems from personality disorder, the substance abuse is going to aggravate them." (Tr. 830). He stated that the review of the drugs she was using showed that plaintiff was also abusing the medications prescribed by Dr. Kodali. (Tr. 831).

On November 23, 2009, the ALJ rendered his hearing decision. He found that the plaintiff has severe impairments of aortic valve disease, aneurysm of the ascending aorta, and degenerative disc disease of the lumbar and cervical spine. (Tr. 14). He then found that the plaintiff had the residual functional capacity to perform the full range of light work. (Tr. 15). He then discussed the testimony of Dr. Schacht in great detail, along with the records and opinions of Dr. Kodali. He noted that Dr. Schacht opined that Dr. Kodali's assessment was not consistent with his own treatment records. He discussed the basis for Dr. Schacht's

---

[1] Although Dr. Lawhon did not use a form which defined "moderate," (Tr. 348-52), the Court agrees with Dr. Schacht's definition, that a person with moderate limitations can still function "satisfactorily," when that term is used in Social Security law.

9

opinion regarding the plaintiff's drug abuse. He went into great detail regarding the reports of Dr. Lawhon and psychological examiner Elizabeth Jones. He then pointed out that Dr. Schacht opined that drug abuse was "the most objectively established impairment..." that the plaintiff had from a mental standpoint. (Tr. 16-17). The ALJ found Dr. Schacht's testimony credible and consistent with the record. (Tr. 18).

The ALJ then discussed the State Agency psychologist's opinions regarding plaintiff having moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. He then stated that he agreed with Dr. Schacht's opinion that there were no records of antisocial personality disorder and that substance abuse would "mimic" any real symptoms of such a personality disorder. He discussed the plaintiff's doctor shopping and filing simultaneous prescriptions for controlled substances at various pharmacies, and her comments about buying drugs off the streets daily and that "rules are made to be broken." He noted that the MMPI indicated exaggeration of symptoms.

He then discussed the opinion evidence in detail, and gave no weight to the opinion of Dr. Kodali, stating the reasons for that weight. He found the opinion of Ms. Jones and Dr. Lawhon, and found them "generally consistent" with his finding that the plaintiff does not have a severe mental impairment. He gave great weight to Schacht. (Tr. 18-19).

He then discussed in equally great detail the testimony of Dr. Blickenstaff and found it "credible and consistent with the overall medical evidence of record." He discussed the consultative examination of Dr. Breeding. He stated his reasons for finding that the plaintiff's kidney problems and COPD did not impose more than mild limitations and that they were thus not severe impairments. (Tr. 19-20). The ALJ then discussed her complaints

10

of disabling pain, and his reasons for finding her not credible to the extent her complaints were inconsistent with being able to perform the full range of light work. (Tr. 20).

He gave Dr. Breeding's opinion that the plaintiff was limited to "less than a full range of sedentary work" little weight because it was inconsistent with his own findings on examination and the other evidence in the record. He gave significant weight to the opinions of Dr. Blickenstaff. The ALJ noted that even though the State Agency physicians opined that the plaintiff could perform the full range of medium work, he was giving her the benefit of the doubt in finding she could only do a full range of light work. (Tr. 21).

He then found that based upon his RFC finding, a person of plaintiff's age, education, and vocational characteristics was "not disabled" under Medical-Vocational Rule 202.21. Accordingly, he found the plaintiff to be not disabled. (Tr. 21-22).

Plaintiff argues that the RFC of the full range of light work lacks substantial evidence because she has a mental impairment. Of course, the existence of a severe mental impairment would preclude the full range of work at any level and require the use of a vocational expert to establish the existence of particular jobs an individual with those limitations could perform. Also, the Court well understands, and indeed enforces, the de minimis standard utilized in the Sixth Circuit, which states "the step two severity regulation...has been construed as a *de minimis* hurdle in the disability determination process...Under the prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *citations omitted.*

However, the ALJ relied upon his own review of the record and the in depth analysis of Dr. Schacht to determine that a severe mental impairment beyond the effects of plaintiff's unfortunate drug dependency was simply not established. It is well settled that a testifying medical expert who has studied the entire medical history, as Dr. Schacht did in this case, can provide substantial evidence for the findings of the Commissioner even in the face of contrary, but questionably supported, opinions of treating sources. Regarding the plaintiff's drug use and obviously deceptive and even illegal means in obtaining those drugs, the Court notes that seeking Social Security disability benefits is not a morality play. Nonetheless, where a competent medical source says, as Dr. Schacht does here, that this behavior makes it in essence impossible to see whether there really is an underlying mental impairment of any degree of severity, there is substantial evidence for an ALJ to find a lack of support for a claimed severe mental impairment. It is no stretch of the imagination to feel that Dr. Kodali might have had a different impression had he known the extent of the plaintiff's schemes to obtain narcotics, both through the use of multiple unknowing physicians and through deals made on the street.

Likewise, Dr. Blickenstaff unequivocally stated that other than a lifting restriction which was less restrictive than that found by the ALJ, the plaintiff had no other physical restrictions. As a medical expert trained in occupational medicine, his opinion based upon a review of the entire record is no less substantial evidence under Sixth Circuit law than that of Dr. Schacht on the plaintiff's lack of a provable severe mental impairment.

There is substantial evidence to support the ALJ's finding of residual functional capacity, and for his finding that the plaintiff does not suffer from a severe mental

12

impairment. His use of the Grid was therefore appropriate. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be GRANTED.[2]

Respectfully submitted:

                                           s/ Dennis H. Inman
                                           United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).